## Stewart Coal Company v. Louisville & Nashville Railroad Company.

(Decided February 9, 1932.)

N. R. PATTERSON and W. E. STEWART for appellant.

LOW & BRYANT and ASHBY M. WARREN for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On March 31, 1917, the Louisville & Nashville Railroad Company entered into a contract with the Orby Coal Company by which it agreed to furnish the latter the necessary rails, splices, spikes, etc., for the construction of a coal-loading track, which was afterwards constructed near the station of Orby. Under the contract the railroad company had the right to remove the track at any time at the cost of the coal company. On May 31, 1923, the Stewart Coal Company, a partnership composed of Lewis Stewart, W. E. Stewart, John Stewart, Jr., and J. C. Stewart, Sr., became the owner of the property of the Orby Coal Company, including its interest in the coal-loading track, and the written contract between the railroad company and the Orby Coal Company was by writing assigned and transferred to the Stewart Coal Company.

In May, 1925, the railroad company removed the coal-loading track at an actual cost of $181.48. Thereafter it brought suit against the Stewart Coal Company to recover that amount. The Stewart Coal Company filed an answer and counterclaim denying the allegations of the petition and seeking a recovery of several sums based on a written contract signed by the Stewarts on April 28, 1925, and claimed to have been accepted by the railroad company, by the terms of which the railroad company agreed before the removal of the track to remove the track material at its own expense, and replace it a short distance south of its location before removal. After its demurrer to each paragraph

of the answer and counterclaim had been overruled, the railroad company filed a reply denying the affirmative allegations of the answer and counterclaim, pleading, in substance, the following facts: G. R. Smiley, chief engineer of construction of the railroad company, in a letter to the defendants, offered to remove and replace the sidetrack at the cost of the railroad on certain terms and conditions mentioned in the letter, and prepared and sent to the defendants a release from them to the railroad company of certain damages which might occur in the removal of the track. The defendants refused to execute the release as prepared by Mr. Smiley, but interlined and altered and changed the same before executing it, and Mr. Smiley for the railroad company refused to accept the document as changed, and so notified the defendants. He also notified them that the railroad company would remove the track under the terms of the original agreement between the Orby Coal Company and the railroad company. After hearing the evidence, the court peremptorily instructed the jury to find for the railroad company. The coal company appeals.

It developed on the hearing that on March 27, 1925, Chief Engineer Smiley wrote to the Stewarts that, if they desired a track of similar length built to serve their operations, the railroad would be glad to do the grading without cost if they would give the railroad company a release from damages that might occur from slides, etc., and informed the Stewarts that, if the company did its work, it would be necessary for them to give a paper releasing the company from damages if they desired the grading done at the expense of the railroad company. This letter was delivered to the Stewarts, and they answered declining the proposition and making a proposition of their own. By letter dated April 15, 1925, Mr. Smiley declined the counter proposition, and told the Stewarts that the railroad company would do the necessary work provided they would sign and deliver to resident engineer, Dollarhyde, the "inclosed release" from damages, etc. The Stewarts refused to sign the release inclosed with the letter unless it was altered to meet their views, and it was returned to Mr. Smiley by Mr. Dollarhyde. On April 27, 1925, Mr. Smiley wrote the Stewarts a letter in which he referred to the return of the agreement unsigned, and stated that they would assume no responsibility for damages from blasting,

and that the present contract covered a release from liability for loss by fire, which they were unwilling to waive. This letter, together with the inclosed release, was delivered to and left with the Stewarts on April 28. Thereupon the Stewarts made certain alterations by interlineation, and signed the agreement, retaining one copy and delivering the other to Mr. Dollarhyde. The retained copy was acknowledged by the Stewarts and put to record. The altered and interlined copy delivered to Mr. Dollarhyde was then sent to Mr. Smiley, who received it on April 30. On that date Mr. Smiley wrote to the Stewarts that he had received from Engineer Dollarhyde the agreement to which they had added certain clauses to which they had been previously advised that the railroad company had not agreed. He further advised them that the altered and interlined lease was not acceptable, and that the company would proceed to remove the track and charge the cost of removal to them as provided in the original contract. W. E. Stewart states that the interlineations were made in the presence of Mr. Dollarhyde and that he agreed to the changes. Mr. Dollarhyde says that he delivered the contract to the Stewarts in their office, and they returned it to him containing the interlineations, and that he did not see the interlineations made and did not agree to them. W. E. Stewart further testified that Mr. Dollarhyde's letter of April 30 was not delivered until May 5, which was after the removal of the track. Mr. Dollarhyde testified that the letter was delivered on May 1, and that he wrote Mr. Smiley that he had returned the letter on that day. It further appeared that Mr. Dollarhyde did write a letter to Mr. Smiley dated May 1, 1925, in which he stated that he delivered Mr. Smiley's letter of April 30, 1925, on May 1, and referred to the changes made in the contract by the Stewarts. The letter was stamped as being received on May 2, 1925.

The case turns on whether the altered and interlined release was accepted by the railroad company. If it had been made to appear that Mr. Dollarhyde was in charge of the negotiations, and that the Stewarts dealt with him alone, there might be some merit in the contention that it was within the apparent scope of Dollarhyde's authority to agree to the changes in the release, and accept it on behalf of the company. The correspondence shows that

the negotiations were being conducted on behalf of the company by Mr. Smiley, the chief engineer; that he informed the Stewarts that their counter proposition was not acceptable to the railroad company, and that the railroad company would do the necessary grading, etc., provided they would sign and deliver to Dollarhyde, the resident engineer, the "inclosed release," and further that, unless the Stewarts were willing to execute the agreement, which was the only one that the railroad company was prepared to offer, the railroad company would proceed under the original contract. Furthermore, immediately on receiving the altered release, the Stewarts were advised that it was not acceptable to, and would not be accepted by, the railroad company. Thus throughout the negotiations the Stewarts were informed by Mr. Smiley that he was acting on behalf of the railroad company, and was insisting that the execution of the original release was necessary before the railroad company would undertake to do anything other than set forth in the original contract. From those letters it was apparent to the Stewarts that Mr. Dollarhyde was acting as a mere messenger through whom the letters were interchanged, and that he had neither actual nor apparent authority to agree to any changes in the release prepared by Mr. Smiley and delivered by him to the Stewarts, or to accept the changed release on behalf of the company. In short, not only was Dollarhyde a special agent with limited authority, but the letters to Mr. Smiley were sufficient to bring notice of this fact to the Stewarts. A principal is never bound where a person dealing with his agent knows, or has reason to know, that the agent is exceeding his authority. Nolin Milling Co. v. White Grocery Co., 168 Ky. 417, 182 S. W. 191. In the circumstances, Dollarhyde's agreement to the changes in the release, and acceptance of the release as changed, even if Mr. W. E. Stewart's evidence on the question be accepted as true, were not binding on the railroad company. Godshaw v. J. N. Struck & Bro., 109 Ky. 285, 58 S. W. 781, 22 Ky. Law Rep. 820, 51 L. R. A. 668.

It follows that the directed verdict was proper.

Judgment affirmed.